## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| DICK'S SPORTING GOODS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | Hon. |
| FORBES/COHEN FLORIDA | ) | |
| PROPERTIES, L.P., and THE GARDENS | ) | JURY TRIAL DEMANDED |
| VENTURE LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## DICK'S SPORTING GOODS, INC.'S COMPLAINT

Plaintiff Dick's Sporting Goods, Inc. ("DICK'S") hereby files this Complaint against Defendants Forbes/Cohen Florida Properties, L.P. ("Forbes") and The Gardens Venture LLC ("Gardens Venture") (collectively "Defendants"), demands a jury trial, and states as follows:

## NATURE OF THE ACTION

1.     DICK'S is America's largest sporting goods retailer, operating approximately 850 full-line and specialty retail locations across the country.  DICK'S has locations throughout Florida, including Dick's Sporting Goods branded retail stores and other separately branded specialty sporting goods stores.  By this action, DICK'S seeks damages for Defendants' intentional and malicious interference with DICK'S ability to sublease from Transform Operating Stores LLC ("Transform")—successor entity to Sears, Roebuck, and Co. ("Sears")—a portion of the Sears building at the Gardens Mall (the "Gardens") in the City of Palm Beach Gardens, Florida (the "City") (hereinafter, the "DICK'S Sublease").[1]

---

[1]     On October 15, 2018, Sears filed a chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York, and ultimately reorganized under a new entity called

2.     This is not the first lawsuit filed against Forbes for misconduct related to the DICK'S Sublease; it is just the latest in a series of lawsuits.  In 2014, Sears filed a lawsuit against Forbes and the City seeking a declaration that Sears' contracts with Forbes—(1) a May 29, 1987 Sublease (the "Forbes/Sears Sublease"), (2) a Construction, Operation and Reciprocal Easement Agreement (the "REA"), and (3) a Supplemental Agreement (collectively, the "Agreements")— gave Sears the right to enter into the DICK'S Sublease without Forbes' approval.  The lawsuit arose after, *inter alia*, Forbes colluded with the City to pass a resolution—Resolution 20, 2012— that purported to require Forbes' approval before an anchor tenant (like Sears) could subdivide its property to implement a sublease (like the DICK'S Sublease).

3.     In July 2017, the Fourth District Court of Appeal of Florida declared that the Agreements unambiguously provide Sears the right to sublease to DICK'S without Forbes' approval.  *Sears, Roebuck & Co. v. Forbes/Cohen Fla. Properties, L.P.*, 223 So. 3d 292 (Fla. 4th DCA 2017) (See Ex. 1 ("Opinion") at 15–17.)  The Fourth District also found that nothing in the Agreements prohibits DICK'S from having an exterior sign on the Sears building at the Gardens (the "Sears Building") and that a sign for Sears' subtenant was an essential component of Sears' subleasing rights under the Agreements.  (*Id.* at 15–16.)

4.     The Fourth District also declared that Resolution 20, 2012—which the City passed at Forbes' behest to stop Sears from subdividing its property—was an unconstitutional violation of Sears' contractual and substantive due process rights, and awarded Sears its attorneys' fees.  (*Id.* at 18.)  The Fourth District held that Resolution 20, 2012 was unconstitutional because it impaired

_____

Transform Holdco LLC.  Transform Operating Stores LLC is a subsidiary of Transform Holdco, and it owns the Sears building at the Gardens.  Unless the distinction between Sears and Transform is otherwise relevant to the allegations contained herein, the Complaint will refer to Sears and Transform collectively as "Sears."

2

Sears' pre-existing right under the Agreements to sublease without Forbes' approval (*id.* at 7–10), and ceded the City's police power to Forbes without providing any criteria for how Resolution 20, 2012 was to be applied (*id.* at 10–13).

5.      However, due to Forbes' misconduct, DICK'S (and Sears) were wrongfully blocked once again.  DICK'S and Sears were (and had been for some time) ready to break ground on the DICK'S Sublease—which the parties executed on February 20, ***2015***—having worked for months on revising and finalizing plans and having worked with the City to satisfactorily address the City's concerns on certain issues.  Yet Forbes continued to do anything it could to stop them from effectuating the DICK'S Sublease.

6.      Forbes' most recent tactic was to intentionally and maliciously ***refuse to sign*** DICK'S and Sears' development application for an amendment to the City's ordinance governing the Gardens.  The application sought very minor signage and building modifications—to a building that Sears itself owns—necessary to implement the DICK'S Sublease.  DICK'S attempted to engage Forbes in discussions to resolve any concerns over the exterior changes, and even solicited a CEO-to-CEO meeting, which Forbes refused.

7.      Forbes' pretextual basis for refusing to sign the application was that the requested modifications did not comply with the City's ordinance governing the Gardens.  This "explanation" is nonsensical and circular, as the application was a request for an ***amendment*** to the City's signage regulations, and nothing in Sears' lease with Forbes gave Forbes the right to veto this request.

8.      Forbes knew that its refusal to sign put DICK'S and Sears in a Catch-22.  On the one hand, Forbes knew that the City would not review DICK'S and Sears' application to amend the City ordinance without Forbes' signature on it.  On the other hand, Forbes refused to sign the

application because it (baselessly) claimed that the application did not comply with the *very provisions of the City ordinance that DICK'S and Sears sought to amend*.

9.     Forbes' refusal is a sham for the additional reason that, over the past two decades, Forbes has routinely signed applications for several other tenants at the Gardens for the very same type of signage and building modifications that DICK'S and Sears sought. For example, Forbes signed an application submitted to the City by Macy's allowing for multiple signs on each façade of its building and exterior signs for its former subtenant Figs and current subtenant Don Pepi Pizza.  The modifications DICK'S and Sears sought here are even more minor than the Macy's modifications—namely, to replace an existing Sears sign with a DICK'S sign and to re-center (by a few feet) the entrance to the second floor of the Sears Building.

10.     Forbes' multi-year scheme of interference and obstruction had one aim:  to keep DICK'S out of the Gardens Mall.  Ultimately, Forbes got what it wanted.  On December 20, 2019, almost five years after the DICK'S Sublease was executed, DICK'S was forced to terminate the DICK'S Sublease.

11.     Accordingly, DICK'S seeks compensatory and punitive[2] damages—including for out-of-pocket costs, lost profits, and diminution in value—stemming from Forbes' long-standing, malicious, and intentional interference with the DICK'S Sublease.

## JURISDICTION AND VENUE

12.     This Court has general and specific personal jurisdiction over Forbes because it (a) owns and operates the Gardens; (b) has its principal place of business in Florida; and (c) conducts

---

[2]     In *Cohen v. Office Depot, Inc.*, 184 F.3d 1292 (11th Cir. 1999), the appellate court held that Fla. Stat. §  768.72 conflicts with and must yield to the "short and plain statement" rule contained in Federal Rule of Civil Procedure 8(a)(2), and as a result, a plaintiff in federal court because of diversity jurisdiction need not obtain leave of court before pleading a request for punitive damages.  *Id.* at 1295–99.

continuous, systematic, and substantial business and activities within Florida, including the activities and conduct from which this dispute arises.  These activities place Forbes within the scope of Florida's long-arm statute.  *See* Fla. Stat. § 48.193.  According to Forbes' 2020 Foreign Limited Partnership Annual Report filed with the Florida Secretary of State, Forbes' principal place of business is in Palm Beach Gardens, Florida.  In addition, Forbes' continuous, systematic, and substantial business, activities, and conduct in Florida, including those from which this action arises, constitute sufficient "minimum contacts" with Florida to satisfy constitutional due process concerns.

13.     This Court has general and specific personal jurisdiction over Gardens Venture because it (a) owns the land on which the Gardens is located and leases that land to Forbes, and (b) conducts continuous, systematic, and substantial business and activities within Florida, including the activities and conduct from which this dispute arises.  These activities place Gardens Venture within the scope of Florida's long-arm statute.  *See* Fla. Stat. § 48.193.  Also, Gardens Venture's continuous, systematic, and substantial business, activities, and conduct in Florida, including those from which this action arises, constitute sufficient "minimum contacts" with Florida to satisfy constitutional due process concerns.

14.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332, as the parties to this lawsuit are completely diverse in citizenship and the amount in controversy exceeds $75,000.

15.     DICK'S is a Delaware corporation with its principal place of business in Coraopolis, Pennsylvania.  Thus, for diversity jurisdiction purposes, DICK'S is a citizen of Delaware and Pennsylvania.

16.     Forbes is a Michigan limited partnership headquartered in Palm Beach Gardens, Florida.

17.     Based upon DICK'S diligent investigation, including a review of publicly available information, Forbes' limited partners are TRG Gardens LLC ("TRG"), Nathan Forbes, David Forbes, the Nancy Katzman Trust, the Michael N. Hartz Marital Trust, the Alan D. Hartz Trust, and the Linda S. Rosen Trust.  (Ex. 2.)  Upon investigation and belief, Nathan Forbes and David Forbes are domiciled in and citizens of Michigan.  (*Id.*)  Upon investigation and belief, the trustees of the Nancy Katzman Trust, the Michael N. Hartz Marital Trust, the Alan D. Hartz Trust, and the Linda S. Rosen Trust are domiciled in and citizens of Michigan or Florida.  (*Id.*)

18.     Upon investigation and belief, Forbes' general partners are SF The Gardens LLC ("SF") and TRG.  (*Id.*)

19.     Upon investigation and belief, SF is a limited liability company organized in the state of Michigan.  (Ex. 3.)  Its manager, and on investigation and belief, its sole member, is Sidney Forbes.  (*Id.*)  Upon investigation and belief, Sidney Forbes is domiciled in and a citizen of Michigan.

20.     Upon investigation and belief, TRG is a limited liability company organized in the state of Delaware.  (Ex. 4.)  Its sole member is The Taubman Realty Group LP ("Taubman").  (*Id.*)  Upon investigation and belief, Taubman's general partners are Taubman Centers, Inc., TG Partners LLC, and Taub-Co Management, Inc.  (Ex. 5.)  Upon further investigation, there is no publicly available information on Taubman's limited partners but, upon DICK'S diligent investigation and belief, they are not citizens of Pennsylvania or Delaware.

21.     Upon investigation and belief, Taubman Centers, Inc. and Taub-Co Management, Inc. are corporations organized in the state of Michigan with their principal place of business in

the state of Michigan.  (Exs. 6 & 7.)  TG Partners LLC is a limited liability company organized in the state of Delaware.[3]  (Ex. 8.)  Upon investigation and belief, its sole member is TG Michigan, Inc., which itself is a corporation organized in the state of Michigan, with its principal place of business in Michigan.  (*Id.*; Ex. 9.)

22.     Gardens Venture is a Michigan limited liability company headquartered in Southfield, Michigan.  (Ex. 10.)  Upon investigation and belief, Forbes is the sole member of Gardens Venture and controls Gardens Venture.  (*Id.*)  Forbes owns the Gardens, and leases the land on which the Gardens is located from Gardens Venture.

23.     Venue is proper in the United States District Court for the Southern District of Florida because a substantial part of the events or omissions giving rise to the claim occurred within this district, a substantial part of the property that is the subject of this action is situated within this district, all parties conduct business within this district, and the causes of action accrued within this district.

24.     All conditions precedent to filing this lawsuit have occurred, have been performed, or have been waived.

---

[3]   If Defendants claim a lack of complete diversity or the existence of complete diversity is otherwise questioned, then the Court should order Defendants to promptly file citizenship affidavits which identify all partners and members (and all sub-partners and sub-members) of the Defendants and their respective citizenships, and permit DICK'S to take targeted, limited jurisdictional discovery.  *See, e.g.*, *Turner v. Wells*, No. 15-CV-61855, 2017 WL 364428, at *1 (S.D. Fla. Jan. 25, 2017); *JPMCC 2005-CIBC13 Collins Lodging, LLC v. Philips S. Beach, LLC*, No. 10-20636-CIV, 2010 WL 11452084, at *3 (S.D. Fla. July 2, 2010);  *Godiciu v. J.P. Morgan Chase Bank, N.A.*, No. 12-60533-CIV, 2012 WL 4370263, at *2 (S.D. Fla. Sept. 24, 2012); *see also Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 109 (3d Cir. 2015); *Carolina Cas. Ins. Co. v. Team Equip., Inc.,* 741 F.3d 1082, 1087 (9th Cir. 2014).

## FACTUAL BACKGROUND

### The Forbes/Sears Sublease and Related Agreements

25.     On May 29, 1987, Forbes, as landlord, and Sears, as tenant, entered into the Forbes/Sears Sublease, pursuant to which Sears leases the land upon which the Sears Building at the Gardens was constructed.  The parties also entered into a Supplemental Agreement and separately entered into the REA.

26.     Pursuant to the 1984 Ground Lease between the MacArthur Trust and Forbes (the "MacArthur/Forbes Ground Lease"), Sears holds the title to the Sears Building that Sears constructed at the Gardens.  (Ex. 11.)

27.     The Forbes/Sears Sublease had an initial term of 30 years.  (Ex. 12 ("Forbes/Sears Sublease") at § 3(a).)  Sears has subsequently extended the Forbes/Sears Sublease for the first of four separate ten-year extension periods.  The total possible term for the Forbes/Sears Sublease is 70 years.  (*Id*. at § 3(a)–(b).)

28.     The Sears Building constitutes approximately 148,638 square feet on two levels in a self-contained structure.  The Sears Building has entrances to the interior of the Gardens on both its first and second floors.

29.     As provided in the Forbes/Sears Sublease, and confirmed by the Fourth District Court of Appeal, Sears has broad rights to sublet its space during the term of the Forbes/Sears Sublease.  Where, as with DICK'S, Sears is subletting less than "all or substantially all" of the Sears Building, the Forbes/Sears Sublease does not provide Forbes any right to approve or disapprove of any Sears-proposed retail subtenant or sublease.  (Opinion at 15–17.)

30.     The REA specifically recognizes Sears' subleasing rights.  As the Fourth District Court of Appeal confirmed, the REA permits Sears to sublease its store for "retail and service

purposes," (Ex. 13 ("REA") § 13.1(a)(2)), and "states that Sears may 'lease all [or] any portion(s) of its building and/or license departments therein . . . .'"  (Opinion at 16 (quoting REA § 13.4(a)).)

### Forbes Routinely Signs Applications to Amend the Gardens PUD

31.     The Gardens was developed pursuant to City Resolution 62, 1984—a planned unit development ("PUD") which permitted the development of the Gardens subject to certain requirements and restrictions (the "Gardens PUD").  City ordinances require that virtually all changes to a building that is subject to a PUD require an amendment to that PUD.

32.     Amendments to a PUD are governed by City Ordinance Section 78-49.  Section 78-49 defines almost any change to a building subject to a PUD—including routine building and signage modifications—as a "major amendment" that then requires compliance with an application process described in City Ordinance Section 78-46.

33.     Section 78-46 states in relevant part:

**Sec. 78-46. - Application Procedures**

(e)     *Application requirements*.  Applications for development order approval shall submit the information required by these regulations or the growth management department, and described herein.  Additional copies may be requested by the growth management director.  ***A description of information or items that may be requested is presented below***:

. . . .

(5)     Authority. A statement of the applicant's interest in the property and:

. . . .

d.     ***If a lessee, a copy of the agent's authorized agreement or written consent of the owner.***

*Id.* (emphasis added).[4]

---

[4]     Section 78-46 states that where a lessee is seeking a PUD amendment, the City "***may***" seek "the agent's authorized agreement or written consent of the owner," but such consent is not mandatory.  Section 78-46 does not state why such consent should be sought, when it is

34.     Since the establishment of the Gardens, new tenants, existing anchor tenants (defined as "Major" tenants in the REA), and Forbes itself have routinely applied for amendments to the Gardens PUD from the City.  (REA at §§ 1.15–16.)  Many of those amendments were sought to allow Major tenants to have multiple signs per store façade, to allow signs for subtenants of Major tenants (like DICK'S), and to allow exterior signs for tenants at the Gardens who were not Major tenants and were not located in buildings of Major tenants.  In addition to signage, applicants sought amendments to the Gardens PUD that addressed the construction of entirely new buildings at the Gardens, outdoor seating, and numerous other physical changes to structures and landscaping at the Gardens, far more extensive than what Sears and DICK'S sought.

35.     Since at least 2004, Forbes has routinely signed—in its capacity as the "owner" of the Gardens—statements of ownership and financial responsibility that purport to authorize these applications for amendments to the Gardens PUD, which the City repeatedly accepted.

36.     For example, in 2004, Forbes signed such a statement on an application submitted by a real estate advisor on Forbes' behalf.  (*See* Ex. 14 at 1–2.)  The application sought an expansion of the Gardens to allow for the construction of the Nordstrom building and the expansion of the Macy's and Saks Fifth Avenue buildings.  (*Id.*)  It also sought to have two signs per façade—on both the west and east façades—of the Macy's building.  (*Id.* at 3.)  It also requested signage waivers for Saks Fifth Avenue, Macy's, and Nordstrom for signs larger than those permitted by the City's signage ordinance.  (*Id.*)  On August 19, 2004, the City passed Resolution 159, 2004, which amended the Gardens PUD to allow for each of these items.  (*Id.* at 6.)

---

appropriate to seek it, or on what basis an "owner" may or may not consent.  In short, Section 78-46 provides no standards whatsoever for seeking, and receiving, an owner's consent.

37.     Subsequent to Resolution 159, 2004, Forbes signed a "Letter of Authorization" and "Financial Responsibility Form" for an application to amend the Gardens PUD submitted by Macy's.  (Ex. 15 ("Macy's 2008 Application") at 9–10.)  This application sought to add an exterior trellis and a third sign to the west façade of the Macy's building at the Gardens for Macy's subtenant Figs Restaurant.  (*Id.* at 5–7, 12.)  The City passed Resolution 83, 2008 on September 18, 2008, permitting the exterior trellis and third sign.  (*Id.* at 1–4.)  Macy's now has three signs on the west façade of its building—two for Macy's and one for its restaurant tenant, currently Don Pepi Pizza.

38.     Forbes has also signed several other similar statements purporting to authorize applications for signage and building modifications at the Gardens, including:  (1) an application seeking an exterior sign on the Sears Building for Jiffy Lube (Resolution 110, 1995); (2) an application allowing for the construction of Brio Tuscan Grille and P.F. Chang's China Bistro (two entirely new buildings at the Gardens) and permitting each to install two exterior signs on their respective buildings (Resolution 15, 2002); and (3) an application approving a waiver of the Gardens PUD's signage limitations and permitting other amendments to allow for the construction of a Cooper's Hawk Winery and Restaurant, including allowing exterior signage and seating (Resolution 74, 2017).  Each of these applications was approved by the City.

39.     In the applications for these prior Gardens PUD amendments, Forbes regularly identified itself as the "fee simple title owner" of the parcel on which the Gardens was constructed and the City regularly accepted Forbes' signature as "owner," even though Forbes leases the Gardens parcel from the fee owner Gardens Venture.

40.     Upon information and belief, Forbes signed these applications with the knowledge, consent, and authorization of Gardens Venture and/or as an authorized agent or representative of Gardens Venture.

### DICK'S Enters Into Sublease With Sears

41.     In 2011, Sears began consolidating its retail activities in its building in order to sublet a portion of the second floor to another retailer.  In particular, Sears engaged in discussions with DICK'S to have DICK'S sublease a portion of the second floor.

42.     On May 7, 2014, DICK'S and Sears executed a written letter of intent that would allow DICK'S to sublease a portion of the top floor of Sears' two-story building.  (Ex. 16.)

43.     On February 20, 2015, DICK'S entered into a sublease with Sears for the portion of the top floor called for in the letter of intent (the "DICK'S Sublease").  (Ex. 17.)

### Forbes Conspires With the City to Stop Sears from Subleasing to DICK'S

44.     In 2011, Sears informed Forbes of its plans to sublet a portion of the second floor to another retailer.  Sears also informed Forbes that DICK'S would be the likely tenant.  Although it had no right to do so (as the Fourth District Court of Appeal confirmed), Forbes objected to Sears' efforts to sublease a portion of the Sears Building to DICK'S because Forbes believes that DICK'S does not "belong in a center like the Gardens."

45.     Forbes understood that the Forbes/Sears Sublease and REA unambiguously provide that Sears has the right to sublease less than "all or substantially all" of the Sears Building to another retailer.  As a result, Forbes attempted to use the City to rewrite those agreements.  Specifically, in early 2012, Forbes representatives met with City representatives—without notifying Sears—to discuss Sears' plan to sublease the Sears Building.

46.     Forbes is the largest taxpayer in the City.

47.     Ultimately, Forbes colluded with the City to draft and secretly pass—on a consent calendar without notice to the affected parties—an unconstitutional resolution that purported to amend the Gardens PUD ("Resolution 20, 2012").

48.     Like numerous other applications to amend the Gardens PUD, the application for Resolution 20, 2012 contained both a Statement of Ownership and Financial Responsibility Form, both signed by Forbes as the "owner" and accepted by the City.   (Ex. 18.)

49.     In substance, Resolution 20, 2012 required Major tenants (like Sears) to obtain Forbes' approval and the City Council's approval before subleasing at the Gardens and both Forbes and the City Council could refuse to give approval for any reason or no reason whatsoever.  Forbes and the City passed Resolution 20, 2012 without notice to Sears or any of the other Major tenants at the Gardens, even though Resolution 20, 2012 was passed to restrict the rights of the Major tenants at the Gardens, including Sears.

50.     Indeed, Sears did not learn about Resolution 20, 2012 until six months after the City passed it.

### Sears Litigates Against Forbes—and Wins

51.     In March 2014, Sears initiated an in-person meeting with Forbes regarding the DICK'S Sublease.  A representative from DICK'S attended the meeting as well.  During that meeting, and although it had no right to do so, Forbes objected to the DICK'S Sublease because DICK'S was not "right for the mall."

52.     Once it became clear to Sears and DICK'S that, despite Sears' unambiguous subleasing rights in the Agreements, Forbes would attempt to block DICK'S as a subtenant at the Gardens, Sears filed suit against Forbes in state circuit court in Palm Beach County, Florida to have its rights declared under the Agreements (the "Sears Suit").  Sears later added the City as a defendant to the Sears Suit—after the City refused to repeal Resolution 20, 2012—and brought

constitutional claims against the City in addition to the declaratory relief Sears sought against Forbes.  (Ex. 19.)

53.     Following trial and appeal to the Fourth District Court of Appeal, the Fourth District declared that Sears had the right to sublease to DICK'S, declared that Resolution 20, 2012 was an unconstitutional violation of Sears' substantive due process rights and right to contract, and awarded Sears attorneys' fees against the City.  (Ex. 1.)

54.     Regarding the need for DICK'S to have an exterior sign, the Fourth District Court of Appeal specifically found that Sears' right to sublease would be illusory if DICK'S was prohibited from having a sign:

> It would be unreasonable to conclude that both the Forbes-Sears sublease and R.E.A. expressly and unequivocally permit Sears to sublease to a retailer while at the same time conclude that the R.E.A.'s signage criteria implicitly prohibits a retail subleasee, such as Dick's, from installing a sign.  Where the contract unambiguously gives Sears the right to sublease, we will not rewrite the parties' agreements to add to the agreements, such as in this case, a prohibition on signage. ***To do so would effectively eviscerate Sears's right to sublease and render its express contractual rights merely illusory.***

(Opinion at 17 (emphasis added) (internal citation omitted).)

### DICK'S and Sears Apply for an Amendment to the Gardens PUD

55.     After Sears won its suit against Forbes and the City, DICK'S and Sears attempted to implement the DICK'S Sublease.  From the fall of 2017 through May 2018, DICK'S and Sears had numerous meetings with the City regarding various aspects of the DICK'S Sublease.  At no time in any of these meetings did the City express any concern with the signage and other incidental modifications to the Sears Building that were being proposed by DICK'S and Sears. Among other things, DICK'S and Sears submitted drawings for review by the architect identified

in the Gardens PUD for review of changes to the Mall, and the proposal was approved by the architect.  (*See* Ex. 20.)

56.     The culmination of months of work by DICK'S and Sears with the City was the submission of a development application to seek amendment to the Gardens PUD, just as numerous other tenants at the Gardens had done in the past with the approval of Forbes and the City.

57.     While, as discussed above, City ordinances require a PUD amendment for most changes to structures covered by a PUD, here the Gardens PUD specifically provides that "[o]ne wall sign for each anchor department store façade representing typical identification by sign logo, style, and illumination indigenous to that anchor department store will be allowed."  (Ex. 21 ("Gardens PUD") at § 6.)  Thus, to the extent DICK'S and Sears were seeking more than a single sign per façade on the Sears Building, a PUD amendment would be needed—as requested and approved for numerous other tenants in the past (*e.g.*, Macy's request for three signs per façade discussed above).

58.     On May 3, 2018, DICK'S (with Sears' approval) submitted a development application to the City for an amendment to the Gardens PUD (the "May Development Application").  The May Development Application mainly sought an amendment to allow DICK'S and Sears to do three things:  (1) to display two signs (one Sears and one DICK'S) on the south and east façades of the Sears Building; (2) to display three signs (one Sears, one DICK'S, and one Sears auto center) on the north façade of the Sears Building; and (3) to move the existing entrance on the south elevation of the Sears Building a few feet east so that it is centered.  (Exs. 22–23.)

59.     The May Development Application contains a "Statement of Ownership and Designation of Authorized Agent."  The statement is signed by Sears (as the owner of the Sears

Building), and appoints DICK'S as its authorized agent to submit the May Development Application to the City and effectuate the development plan. (Ex. 22 at 5.)

60.     The May Development Application also contains a "Financial Responsibility Form" (collectively with the Statement of Ownership form, the "Forms"). The form is signed by Sears as the "owner" of the Sears Building, and DICK'S as the "designee." The form establishes that Sears is financially responsible for the professional fees and expenses associated with the City's consideration of the May Development Application, but also establishes that DICK'S "shall be invoiced" for those fees and expenses as Sears' designee. (Ex. 22 at 6.)

61.     Sears, and not Forbes or Gardens Venture, owns the Sears Building. The modifications that DICK'S sought through the May Development Application were limited to the Sears Building.

### **Forbes Ensures That the May Development Application Never Gets Reviewed**

62.     On May 4, 2018, only one day after the May Development Application was submitted, the City issued a Memorandum of Insufficiency to DICK'S regarding the Development Application. The Memorandum states in relevant part:

> Your application has been determined to be insufficient for review and will not be transmitted to the Development Review Committee until the following is provided:
>
> - The Statement of Ownership and Designation of Authorized Agent must be signed by an authorized signatory of Gardens Venture, LLC.
>
> - The Financial Responsibility Form must be signed by an authorized signatory of Gardens Venture, LLC.

(Ex. 23.)

63.     The City has since clarified that it considers Forbes—and not Gardens Venture—to be the "owner" for purposes of the Statement of Ownership and Financial Responsibility Forms and, accordingly, will not process a development application without Forbes' signature.

16

64.     After the City issued the Memorandum, DICK'S followed up with Forbes seeking its signature for the Forms.  Forbes decided not to sign or otherwise cooperate.

65.     Forbes responded that it would not sign the May Development Application, purportedly because it did not comply with the Gardens PUD.  Put another way, Forbes circularly told DICK'S that it would not sign the application to ***amend the existing Gardens PUD because the desired signage requires an amendment to the PUD.***

66.     Upon information and belief, Forbes has also improperly directed the City to withhold approval, in contravention of the Fourth District Court of Appeal's Order and Mandate.

67.     Sears also followed up with correspondence to Forbes (attached hereto as Exhibit 24), making clear that Forbes' refusal to sign the Forms and otherwise cooperate was in direct breach of its obligations to Sears under the REA, was arbitrary and capricious, was inconsistent with how it had treated essentially every other tenant at the Gardens (including the other Major tenants), was tortiously interfering with Sears' rights under the DICK'S Sublease, and was in violation of the very rights the Fourth District Court of Appeal had already determined that Sears possessed.

68.     In response, Forbes stated that it would maintain its circular position on the May Development Application—by refusing to sign any DICK'S/Sears ***application to amend*** the Gardens PUD that was not itself compliant with the existing Gardens PUD that the ***application seeks to amend***.  (*See* Ex. 25.)

69.     By actively insisting on a circular and logical impossibility—demanding that Plaintiff amend the PUD ***before*** amending the PUD—Forbes intentionally and maliciously interfered with the DICK'S Sublease and the DICK'S/Sears business relationship, and utilized improper methods to do so.

70.     Sears also sent correspondence in July 2018 (both directly and through counsel) to the City requesting that the City reconsider its interpretation of Sec. 78-46 and that the City consider the merits of the May Development Application.  (*See* Exs. 26–27.)  Sears asked that the application not be deemed incomplete without Forbes' signature and noted that Forbes could offer its views on the May Development Application as part of the City's review.  The City did not respond to Sears' correspondence in either July or August 2018, likely at Forbes' urging.

### DICK'S and Sears Submit a Revised Development Application

71.     On August 22, 2018, DICK'S and Sears submitted a revised version of the May Development Application to the City (the "August Development Application").  (Ex. 28.)

72.     The August Development Application was an effort to narrow the scope of the modifications sought by DICK'S and Sears to the Sears Building to address any possible issues—however baseless—with building signage.  Specifically, while Forbes has signed and the City has approved several development applications for Gardens PUD amendments to allow for more than one sign per building façade for other Gardens retailers, DICK'S and Sears revised the May Development Application to reflect only one sign per façade—a DICK'S sign on the south façade and a Sears sign on the east and north façades of the Sears Building.

73.     As a result, pursuant to the August Development Application, DICK'S and Sears proposed to leave the current signage configuration on the east and north façades of the Sears Building essentially unchanged.  The August Development Application is also consistent with the provision in the Gardens PUD allowing "[o]ne wall sign for each anchor department store façade," and requires only the most minor of amendments to implement the DICK'S Sublease (*e.g.*, moving the entrance a few feet to center it).  (Gardens PUD at § 6.)

74.     Just as with the May Development Application, the modifications sought through the August Development Application were limited to the Sears Building.

75.     As it had done with the May Development Application, the City again refused to even consider the merits of the August Development Application.  On September 5, 2018, the City finally responded to Sears' July 17, 2018 letter and explained that it would refuse to consider any development application without Forbes' consent.  (Ex. 29.)  The City later confirmed that this position applied to the August Development Application.  (Exs. 30–31.)

76.     DICK'S and Sears also sought Forbes' signature on the Forms for the August Development Application.  Forbes again refused to sign, on fundamentally the same nonsensical and circular grounds that it had previously stated—allegedly because the August Development Application did not comply with the Gardens PUD.  (Exs. 32–33.)

77.     Forbes' decision not to sign the earlier May Development Application constitutes an arbitrary, capricious, and malicious interference with DICK'S and Sears' business relationship. But Forbes' decision not to sign the August Development Application is an even more egregious and malicious interference with the DICK'S Sublease, given that the August Development Application seeks only the most minor of amendments and complies with the Gardens PUD's signage requirements.

78.     Forbes'—and its wholly-owned subsidiary Gardens Venture's—intentional interference with the contractual and business relationship between Sears and DICK'S is due solely to Forbes' malicious animosity towards Sears and DICK'S, based, in part, on Sears' successful prior litigation against Forbes and the City.

79.     The methods that Forbes and Gardens Venture have used, engineering pretextual and illusory "objections" to rudimentary, ordinary course amendments to the PUD, and surreptitious dealings with the City, constitute improper methods.  This is especially true in light

of the *prior judicial determination* that Sears has the right to sublease to DICK'S and to erect the corresponding signage.

### Sears's Second Lawsuit and Transform's Assumption of the Forbes/Sears Sublease

80.     On September 25, 2018, Sears filed a second lawsuit against Forbes, Gardens Venture, and the City in state circuit court in Palm Beach County, Florida (the "Second Sears Suit").  (Ex. 34.)

81.     On October 15, 2018, Sears filed a chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York.  As a result of the bankruptcy, Sears stipulated to a dismissal of the Second Sears Suit without prejudice.  As a result of the bankruptcy, Transform assumed the Forbes/Sears Sublease—and Sears' rights under the REA and Separation Agreement—from Sears in May 2019.

### DICK'S Is Forced to Terminate the Lease, and Forbes and Transform Sue Each Other

82.     After assuming ownership of the Sears Building, Transform again sought to modify the PUD to permit modifications to the Sears Building that would allow DICK'S to take possession of the premises under the DICK'S Sublease.  Specifically, Transform sought to (a) move the entrance to the DICK'S portion of the premises a few feet to the east; and (b) place a DICK'S sign on the south façade and a Sears sign on the east and north façades of the Sears Building.  Once again, Forbes decided not to sign the forms required by the City to modify the PUD (the "November Development Application"), and the City refused to consider the request without Forbes' signature.

83.     On December 3, 2019, Forbes filed a preemptive lawsuit against Transform in state circuit court in Palm Beach County, Florida, seeking a declaratory judgment that it need not comply with Transform's request to sign the forms required by the City to modify the PUD.  On

January 20, 2020, Transform filed counterclaims against Forbes, seeking millions of dollars in damages for Forbes' wrongful conduct in connection with the DICK'S Sublease.

84.     As a result of Forbes' continued intentional, inexcusable, and improper interference with the DICK'S Sublease over many years—which prevented DICK'S from taking possession of the leased premises in the Sears Building—DICK'S was forced to terminate the DICK'S Sublease on December 20, 2019.

### DICK'S Has Been Damaged By Forbes and Gardens Venture's Misconduct

85.     DICK'S is the United States' largest sporting goods retailer and operates hundreds of profitable retail locations across Florida and the rest of the nation.

86.     DICK'S conducted significant due diligence to determine whether it would be profitable to enter into the DICK'S Sublease and develop a DICK'S location in a portion of the Sears Building at the Gardens (the "Subleased Premises").

87.     Based on this due diligence and its prior experience with developing other retail locations, DICK'S reasonably expected that a DICK'S location in the Subleased Premises would be profitable.

88.     Forbes and Gardens Venture's intentional and malicious misconduct, however, first delayed, and then prevented, DICK'S from implementing the DICK'S Sublease and developing a DICK'S location in the Subleased Premises.

89.     Specifically, had Forbes not engaged in a multi-year scheme of interference and obstruction aimed at keeping DICK'S from ever taking possession of the Subleased Premises, DICK'S would have taken possession of the Subleased Premises by October 2016 at the latest.

90.     Indeed, Forbes' multi-year scheme of interference and obstruction was successful—DICK'S was forced to terminate the DICK'S Sublease on December 20, 2019, and it will not take possession of the Subleased Premises.

91.     As a result, DICK'S has suffered and continues to suffer significant financial harm in the form of, *inter alia*, lost profits, lost opportunity cost in the market, compromised goodwill in the community, diminution in value of the DICK'S Sublease, out-of-pocket costs associated with implementing the DICK'S Sublease, and other costs, expenses, and damages.

## FIRST CLAIM FOR RELIEF

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP

## (FORBES AND GARDENS VENTURE)

92.     DICK'S repeats and realleges paragraphs 1–91 above, as if fully set forth herein.

93.     This is an action by DICK'S against Forbes and Gardens Venture for damages in excess of $75,000.

94.     DICK'S had a contractual relationship with Sears pursuant to the DICK'S Sublease whereby Sears agreed to sublease to DICK'S a portion of the Sears Building located at the Gardens.

95.     Forbes and Gardens Venture had knowledge of the DICK'S Sublease since February 2015, and had knowledge of Sears' intent to sublease a portion of the Sears Building to DICK'S since at least 2014.  Forbes was also a party to the Sears Suit, which specifically resolved the question of whether Sears had the right to enter into the DICK'S Sublease pursuant to the Forbes/Sears Sublease and the REA.

96.     Forbes and Gardens Venture intentionally and unjustifiably interfered with DICK'S contractual relationship with Sears by deciding not to sign the May, August, and November Development Applications, despite the fact that (a) the Fourth District Court of Appeal found that Sears has the right under the Forbes/Sears Sublease and REA to enter into the DICK'S Sublease, and (b) Forbes has routinely signed development applications for amendments to the Gardens PUD of a very similar type when requested by other Gardens tenants.

22

97.     Forbes and Gardens Venture's intentional and unjustified interference with DICK'S contractual relationship with Sears—as described herein—prevented the implementation of the DICK'S Sublease and ultimately caused DICK'S to terminate the DICK'S Sublease.

98.     Forbes and Gardens Venture have intentionally and unjustifiably interfered with DICK'S contractual relationship with Sears solely out of malice.  Specifically, Forbes has stated that it does not like Sears and that it wants Sears to forfeit the Forbes/Sears Sublease so that Forbes can exploit the value of the Sears Building for itself.  In addition, Forbes has stated that DICK'S "doesn't belong" at the Gardens and that Forbes will do anything to keep DICK'S out of the Gardens.

99.     Forbes and Gardens Ventures also intentionally and unjustifiably interfered with DICK'S contractual relationship with Sears by utilizing improper methods.  Forbes has—among other improper methods—(a) colluded with the City to pass Resolution 20, 2012 without taking any testimony; (b) ignored the Fourth District Court of Appeal's Order and Mandate finding that Sears had the right to enter into the DICK'S Sublease; (c) retaliated against Sears and DICK'S by refusing to sign the May, August, and November Development Applications; and (d) surreptitiously collaborated with the City to ensure that the May, August, and November Development Applications would not be considered absent Forbes' signature, which Forbes withheld.

100.    As a direct and proximate result of Forbes and Gardens Venture's intentional and unjustified interference with DICK'S contractual relationship with Sears, DICK'S has been damaged and continues to be damaged in the form, *inter alia*, of out-of-pocket costs, lost profits, diminution in value, and other damages.

101.     Defendants' conduct, as alleged in detail above, constitutes "intentional misconduct" within the meaning of Florida Statute § 768.72(2).  Defendants had actual knowledge of the wrongfulness of their course of conduct and the high probability that DICK'S would be injured or damaged thereby.   Nonetheless, Defendants intentionally pursued that course of conduct, resulting in injury or damage to DICK'S.  Defendants actively and knowingly participated in such course of conduct with wanton disregard to the rights and interests of DICK'S.

WHEREFORE, DICK'S prays for a judgment against Forbes and Gardens Venture jointly and severally for compensatory and punitive damages, lost profits, costs, pre- and post-judgment interest, attorneys' fees under any applicable basis, and for such other and further relief as this Court may deem appropriate.

## SECOND CLAIM FOR RELIEF

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

## (FORBES AND GARDENS VENTURE)

102.     DICK'S repeats and realleges paragraphs 1–91 above, as if fully set forth herein.

103.     This is an action by DICK'S against Forbes and Gardens Venture for damages in excess of $75,000.

104.     DICK'S had a business relationship with Sears pursuant to the DICK'S Sublease whereby Sears agreed to sublease to DICK'S a portion of the Sears Building located at the Gardens.

105.     Forbes and Gardens Venture had knowledge of the DICK'S Sublease since February 2015, and had knowledge of Sears' intent to sublease a portion of the Sears Building to DICK'S since at least 2014.  Forbes was also a party to the Sears Suit, which specifically resolved the question of whether Sears had the right to enter into the DICK'S Sublease pursuant to the Forbes/Sears Sublease and the REA.

24

106.     Forbes and Gardens Venture have intentionally and unjustifiably interfered with DICK'S business relationship with Sears by deciding not to sign the May, August, and November Development Applications, despite the fact that (a) the Fourth District Court of Appeal found that Sears has the right under the Forbes/Sears Sublease and REA to enter into the DICK'S Sublease, and (b) Forbes has routinely signed development applications for amendments to the Gardens PUD of a very similar type when requested by other Gardens tenants.

107.     Forbes and Gardens Venture's intentional and unjustified interference with DICK'S business relationship with Sears—as described herein—prevented the implementation of the DICK'S Sublease and ultimately caused DICK'S to terminate the DICK'S Sublease.

108.     Forbes and Gardens Venture intentionally and unjustifiably interfered with DICK'S business relationship with Sears solely out of malice.  Specifically, Forbes has stated that it does not like Sears and that it wants Sears to forfeit the Forbes/Sears Sublease so that Forbes can exploit the value of the Sears Building for itself.  In addition, Forbes has stated that DICK'S "doesn't belong" at the Gardens and that Forbes will do anything to keep DICK'S out of the Gardens.

109.     Forbes and Gardens Venture also intentionally and unjustifiably interfered with DICK'S business relationship with Sears by utilizing improper methods.  Forbes has—among other improper methods—(a) colluded with the City to pass Resolution 20, 2012 without taking any testimony; (b) ignored the Fourth District Court of Appeal's Order and Mandate finding that Sears had the right to enter into the DICK'S Sublease; (c) retaliated against Sears and DICK'S by refusing to sign the May, August, and November Development Applications; and (d) surreptitiously collaborated with the City to ensure that the May, August, and November Development Applications would not be considered absent Forbes' signature, which Forbes withheld.

110.    As a direct and proximate result of Forbes and Gardens Venture's intentional and unjustified interference with DICK'S business relationship with Sears, DICK'S has been damaged and continues to be damaged in the form, *inter alia*, of out-of-pocket costs, lost profits, diminution in value, and other damages.

111.    Defendants' conduct, as alleged in detail above, constitutes "intentional misconduct" within the meaning of Florida Statute § 768.72(2).  Defendants had actual knowledge of the wrongfulness of their course of conduct and the high probability that DICK'S would be injured or damaged thereby. Nonetheless, Defendants intentionally pursued that course of conduct, resulting in injury or damage to DICK'S.  Defendants actively and knowingly participated in such course of conduct with wanton disregard to the rights and interests of DICK'S.

WHEREFORE, DICK'S prays for a judgment against Forbes and Gardens Venture jointly and severally for compensatory and punitive damages, lost profits, costs, pre- and post-judgment interest, attorneys' fees under any applicable basis, and for such other and further relief as this Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff Dick's Sporting Goods, Inc., pursuant to Federal Rule of Civil Procedure 38, hereby demands a jury trial on any and all claims so triable.


Dated:  February 3, 2020                              Respectfully submitted:

HoмeR
Bonner

**Attorneys for Plaintiff Dick's Sporting Goods, Inc.**
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
Phone: (305) 350-5100

By:   */s/ Peter W. Homer*
     Peter W. Homer
     Email: phomer@homerbonner.com
     Florida Bar No. 291250
     Gregory J. Trask
     Email: gtrask@homerbonner.com
     Florida Bar No. 0055883

Yates M. French (*pro hac vice* forthcoming)
Brendan E. Ryan (Florida Bar No. 111741)
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Email: yfrench@kirkland.com
Email: brendan.ryan@kirkland.com
Phone: (312) 862-2000

27